# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND RICHARD PRINE, JR., | Case No. 1:18-cv-01721-SAB |
| Plaintiff, | ORDER GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 13, 15) |
| Defendant. | |

## I.

## INTRODUCTION

Raymond Richard Prine, Jr. ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from depression, hyperlipidemia, lumbar degenerative disc disease; cervical spine disease - cervical radiculitis; and headaches. For the reasons set forth below, Plaintiff's Social Security appeal shall be granted.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 6, 8.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on April 21, 2015. (AR 90.) Plaintiff's application was initially denied on September 16, 2015, and denied upon reconsideration on January 11, 2016. (AR 108-111, 115-119.) Plaintiff requested and received a hearing before Administrative Law Judge Scot Septer ("the ALJ"). Plaintiff appeared for a hearing on September 28, 2017. (AR 34-75.) On January 29, 2018, the ALJ found that Plaintiff was not disabled. (AR 11-28.) The Appeals Council denied Plaintiff's request for review on October 19, 2018. (AR 1-3.)

### A. Hearing Testimony

Plaintiff appeared and testified at the September 28, 2017 hearing with the assistance of counsel. (AR 40-64.) Plaintiff had been living with his sister for about six months. (AR 40.) Prior to that he had been living with his wife. (AR 40.) His sister is currently working. (AR 40.) Plaintiff is right handed. (AR 41.)

During the prior fifteen years, Plaintiff was self-employed doing commercial construction and remodeling jobs. (AR 41.) Plaintiff was a finish carpenter by trade, a skilled craftsman to make furniture. (AR 41.) He is a licensed general contractor, licensed for concrete, and A licensed plumber in California. (AR 42.) He would also do electrical work. (AR 42.) Plaintiff would lift 120 pounds or so when he was working. (AR 43.)

Plaintiff stopped working in mid-2012 to 2013 because he started developing bad headaches and nerve damage in his neck. (AR 43.) His headaches were debilitating. (AR 43-44.) His nerve damage went into both his arms and his hands so that he is not able to do anything with his hands or arms. (AR 44.) Prior to getting the headaches he started losing the use of his left arm because it would go numb. (AR 44.) He went to physical therapy and that worked to some extent but then the nerve damage took over and he went back for physical therapy for his neck and right arm and could not finish physical therapy in 2014 or 2015. (AR 45.)

Plaintiff has had three sessions of physical therapy. (AR 45.) He also has had epidural

injections in his neck to treat the nerve damage in his arms and his neck pain.  (AR 45.)  The epidurals are successful to some extent where it relieves the nerve pain in his hands and arms. (AR 46.)  The injections relieve the pain for three to four months and then he goes back for another injection.  (AR 46.)  He gets significant relief for about three months and then injection wears off.  (AR 46.)  After four months or a little more it will start to really bother him again if he does not have another injection.  (AR 46.)  He has had four to five injections.  (AR 46.)  With each injection he gets more relief.  (AR 47.)

On a typical day, Plaintiff will lay on the couch and prop himself up.  (AR 47.)  He watches television and will listen to the radio or something like that.  (AR 47.)  He will occasionally do dishes, but he breaks things so he does not do them often.  (AR 47.)  He will not be paying attention and he will turn around trying to put a glass in the cabinet and will drop it. (AR 48.)  Plaintiff does not go grocery shopping because he cannot walk that far.  (AR 50.)  His sister does all the laundry.  (AR 50.)  Plaintiff has a car but he does not drive himself because if he drives too far he will start getting headaches and the nerve pain comes back in his arms.  (AR 51.)  Plaintiff has not driven in two to three years.  (AR 51.)  He stopped driving because it became physically difficult due to the effect on his body and the damage in his hands and arms. (AR 51.)  His sister brought him to the hearing.  (AR 52.)

Plaintiff does not do any recreational activities or yard work.  (AR 52, 53.)  It has been ten years since he did anything like hunting or fishing.  (AR 52.)  He had disc surgery in 2006 that stopped him from doing a few things.  (AR 52.)  After his surgery he was great.  (AR 53.) About five to six years later it started to wear off but the discs still seem to be okay.  (AR 53.) Plaintiff has only been recommended medication for pain relief.  (AR 53.)

The ALJ asked about a note in the record that stated in April of 2016 that Plaintiff would mow the back yard and did it without a neck brace.  (AR 53.)  Plaintiff stated that he would have tried to mow the yard but that it would "have been really effective on my hands and neck."  (AR 53.)  Plaintiff tried to walk to get himself back into shape.  (AR 54.)  Plaintiff does walk when he can, but he cannot lift anything without straining his neck and then he gets headaches and pain in his hands.  (AR 54.)  Plaintiff believes that when he is moving and doing things it is mostly his

neck that is radiating down into his arms and hands and causing the headaches. (AR 54.)

Plaintiff will be walking and all the sudden he will feel as if he is falling sideways. (AR 55.) He will lose his balance after walking so far. (AR 55.) His legs work fine, it is his upper body that is the issue. (AR 55.) He will get a twitch or something like when you fall asleep really quick and then wake up startled. (AR 55.) Plaintiff was feeling good after his last shot and tried to do some woodworking. (AR 56.) He was making a frame and was using two sticks to push a piece of wood through the saw and it slipped. (AR 56.) He cut the tip off his left index finger and the nail bed of the front finger and a chuck out of the top knuckle. (AR 56.). He was pushing the piece of wood through the saw blade with the sticks to keep his hands away from the blade. (AR 57.) He was not pushing as hard as he thought he was and the board got bogged down and he pushed just hard enough for the board to come loose and the stick came loose over the top of the board. (AR 57-58.)

Plaintiff is able to lift a gallon of milk or a ten pound bag of cat food. (AR 58.) It is difficult for him to lift or grab because he will strain his neck. (AR 58.) He cannot excessively do something up and down or move his hands too much or it will bring on pain. (AR 58.) His left hand has gotten worse since 2015. (AR 59.) He does not have the ability to feel as much as he did before the therapy. (AR 59.) Both of his hands have gotten worse. (AR 59.) He has only been treated with the epidural shots. (AR 59.)

Plaintiff cannot touch or feel things with his hand and when he grips he has no idea how hard he is gripping. (AR 48.) When he is trying to pinch hard he may not be pinching at all and at other times he may be gripping really tight. (AR 48.) His right hand is worse than his left. (AR 48.) This has been happening for about two years. (AR 49.) He cut his wrist with a saw in 1987 and caused nerve damage to his fingers and thumb. (AR 49.) When Plaintiff saw the consultative examiner in 2015 he had lost the use of his left arm because of his neck. (AR 49-50.) He went to physical therapy for his left side and then the right hand and arm got worse than the left. (AR 50.)

Plaintiff is unable to work because he does not have the ability to sit or stand in one position for very long before getting the pain and sensations in his hands where he loses the

touch and the ability to lift or grab and get headaches. (AR 60.) He has a headache that is about a four all the time and it progresses to a six if he gets too active. (AR 60.) The nerve damage causes him to have sensations and pain in his fingers and stuff. (AR 60.) Sometimes he gets pain so bad that he cannot even touch things if he strains too much or is too active. (AR 60.)

Plaintiff can sit for fifteen to twenty minutes because he has to rest his neck. (AR 61.) After that much time he will have more pain, more pressure in his neck and more sensation in his hands. (AR 61.) When he is at home he will lay down to take the pressure off his neck and head. (AR 61.) Occasionally, he will wear a soft collar but does not have to very often. (AR 62.) Plaintiff has to continually take rest breaks to take the pressure off his head or neck. (AR 62.) Plaintiff will occasionally need to nap during the day. (AR 63.) He will get fatigue from the pain daily. (AR 63-64.)

Plaintiff constantly has pain in his hands and it increases with overuse. (AR 63.) Plaintiff's hand pain was worse when it first came on but he has gotten relief with the epidurals. (AR 63.)

A vocational expert also testified at the hearing. (AR 64-73.)

**B.     ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2018.

- Plaintiff has not engaged in substantial gainful activity since the alleged onset date of May 1, 2014.

- Plaintiff has the following severe impairments: lumbar degenerative disc disease; cervical spine disease - cervical radiculitis; and headaches.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR § 404.1567(b). Specifically, Plaintiff can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He can sit for six hours

total in an eight-hour workday and stand and walk for six hours total in an eight-hour workday. Moreover, Plaintiff is able to frequently climb ramps and stairs. He is occasionally able to climb ladders, ropes, and scaffolds. Further, Plaintiff is able to frequently crouch and kneel. He is occasionally able to crawl and stoop. Additionally, Plaintiff is able to reach overhead bilaterally on an occasional basis. Finally, Plaintiff is able to handle and finger bilaterally on a frequent basis.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on July 30, 1965, and was 48 years old which is defined as a younger individual age 18-49 on the alleged disability onset date.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is not disabled whether or not he has transferable job skills.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.

- Plaintiff has not been under a disability as defined in the Social Security Act from May 1, 2014, through the date of this decision.

(AR 16-27.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th

Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

1 for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

2 susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

3 upheld.").

## IV.

## DISCUSSION AND ANALYSIS

6     Plaintiff contends that the ALJ erred as a matter of law by failing to account for his

7 headache limitations in the residual functional capacity ("RFC") assessment and in the weight

8 provided to his treating physicians' opinions.  Defendant counters that Plaintiff is arguing that

9 the ALJ failed to properly assess his RFC largely because the ALJ did not properly account for

10 Plaintiff's subjective pain symptoms.  Defendant argues that the ALJ properly considered the

11 objective medical evidence and found that his complaints of pain are inconsistent with the

12 objective medical evidence in the record.  Further, Defendant contends that the ALJ properly

13 found that the limitations opined by Plaintiff's treating physicians were unsupported by the

14 objective medical evidence and the ALJ properly evaluated Plaintiff's RFC.

15     **A.**    **Physician Opinion**

16     Plaintiff argues that his treating physicians opined that he had far greater limitations than

17 the ALJ found and that the ALJ erred by failing to consider the factors set forth in section

18 404.1527 before rejecting their opinions, giving greater weight to the opinions of non-treating

19 providers, and failing to provide specific and legitimate reasons to reject his treating physicians'

20 opinions.

21     The weight to be given to medical opinions depends upon whether the opinion is

22 proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d

23 821, 830-831 (9th Cir. 1995).  "Generally, the opinions of examining physicians are afforded

24 more weight than those of non-examining physicians, and the opinions of examining non-

25 treating physicians are afforded less weight than those of treating physicians.  Orn v. Astrue, 495

26 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)).  "If a treating or

27 examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject

28 it by providing specific and legitimate reasons that are supported by substantial evidence."

Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)). The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d at 957.

### 1. Whether the ALJ Considered the Physician Opinions in Isolation

Plaintiff argues that the ALJ discussed the doctors' opinions in isolation from each other without acknowledging that they support each other and that the ALJ was required to consider the consistency of the medical record as a whole. The regulations provide that "[g]enerally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). Here, the ALJ addressed the opinions of Drs. Holvik and Tariq in the same paragraph and found that they were neither well supported by the medical record nor consistent with the medical record as a whole. (AR 25.)

Prior to addressing the physician opinions, the ALJ considered that Plaintiff had been receiving treatment for his headaches since May 2014, and at this time he had full range of motion in this back and neck and a stable gait with adequate range of motion in all extremities, normal strength and tone, and normal motor and cerebellar function. (AR 21, 360-361.)

Plaintiff was next seen in June of 2014 and was found to have no focal deficits on neurological examination and his cranial nerves were grossly intact. (AR 21, 364.) He had a CT scan of this head that was normal that same month. (AR 21, 384.) In July 2014, Plaintiff had an MRI of the head that was normal and an MRI of the cervical spine that indicated status post anterior fusion of C5-C6 moderate to severe bilateral neural foramen narrowing at C3-C4 and mild bilateral neural foramen narrowing at C4-C5 but no signal abnormality of the central cord. (AR 21, 393, 394, 396.) Plaintiff had a normal physical examination in July and August of 2014. (AR 21, 365-366, 368-369.)

The ALJ considered that Plaintiff was seen in November of 2014 and again had a normal

physical examination and reported that he was feeling better and he was noted to be doing very well on his current medications.  (AR 21, 370.)

Plaintiff was seen for medication refills in January 2015, and reported that he was working 2 to 4 hours a day performing odd jobs.  (AR 21, 372.)  Plaintiff had a normal physical examination including a stable gait, painless range of motion in the neck, normal motor function, normal tone, and normal strength with adequate range of motion in the extremities.  (AR 21, 372-373.)

Plaintiff presented with complaints of neck and back pain in May 2015.  (AR 21, 380.) Although Plaintiff had diminished and painful range of motion of the neck and trigger point tenderness of the left trap and scalene, his neck was still supple and symmetric.  (AR 21, 380.) His motor function and cerebellar function were intact.  (AR 21, 380.)  Plaintiff had left shoulder pain with internal and external rotation, and tenderness to palpation of the long head of the biceps, but normal tone and strength and an adequate gait.  (AR 21, 380.)  His cranial nerves were intact.  (AR 21, 380.)

Plaintiff was seen three months later and had a normal physical examination with full and painless range of motion of the neck, a stable gait, normal strength and tone, adequate range of motion of the extremities, and normal neurologic functioning.  (AR 22, 437.)

The ALJ considered that Plaintiff underwent a consultative examination with Dr. Verma in August 2015.  (AR 22, 419-426.)  Although Dr. Verma found diminished range of motion of the bilateral wrists and cervical spine with muscle spasms and tenderness on the posterior neck and bilateral upper back, Plaintiff also had negative straight leg raising bilaterally in both the sitting and supine positions, no significant deformities of the hands, Plaintiff had the ability to manipulate the use of a pen with ease and could approximate his fingers to make a fist without any difficulty bilaterally and had adequate pinch positioning bilaterally.  (AR 22, 422-423.)  Dr. Verma also found normal muscle tone and bulk, normal strength in both the upper and lower extremities, normal coordination and normal gait.  (AR 22, 424.)

Plaintiff was seen in March 2016 and was noted to be able to do a few chores around the house.  (AR 22, 539.)  He had an MRI of the cervical spine in April 2016 that revealed status

post bony fusion and anterior plate and screw fusion of the C5-C6 vertebrae; chronic degenerative disc changes, with loss of disc height at C3-4; and mild disc bulging at C3-4 and C4-5, but no significant central canal stenosis at this level or at other levels of the cervical spine, no subluxations, no fractures, a normal cervical spinal cord, and no other significant cervical spine abnormalities. (AR 22, 464-465.) This same month it was noted that Plaintiff was demonstrating good improvement of his shoulder mobility and strength. (AR 22, 529, 533.)

Plaintiff was seen in June 2016 where it was noted that he was undergoing physical therapy. (AR 22, 624.) Plaintiff was seen for a neurological consultative examination in August 2016. (AR 22, 462-463.) Examination found that he had tenderness to palpation posteriorly to the neck, with diminished range of motion. (AR 22, 462.) He also had full motor strength in both the upper and lower extremities, intact sensory examination, normal cerebellar function, and grossly intact cranial nerves. (AR 22, 463.) Plaintiff was found not to be a candidate for surgery. (AR 463.) Plaintiff was seen on August 26, 2016 by Dr. Tariq. (AR 586.) Plaintiff reported that he was generally able to perform usual activities. (AR 22, 586.) He was found to have limited range of motion due to pain and trigger points in the shoulder that reproduced pain and headache with pressure. (AR 22, 587.) It was noted that Plaintiff had been found not to be a candidate for surgery by two physicians and that his symptoms could not be explained by the MRIs that had been done. (AR 22, 587.)

In September 2016, Plaintiff had physical therapy and reported that he had headaches every day and that he has a TENS unit at home but does not use it. (AR 23, 482.) In October physical therapy notes that he had a cervical fusion planned for November 2016. (AR 23, 470.) Plaintiff was seen again in October 2016 and reported that he had increased pain after driving. (AR 23, 613.) He had a physical examination that showed diminished range of motion of the cervical spine, positive facet loading, and tenderness overlying the paravertebral muscles, left greater than right, bilaterally, but full muscle strength bilaterally, and symmetrically in the upper and lower extremities, negative Phalens and Tinel's tests, negative Hoffman sign, and intact peripheral pulses with no edema or cyanosis. (AR 23, 613.) Plaintiff also had a normal gait, symmetrical deep tendon reflexes bilaterally, and intact cranial nerves. (AR 23, 613.)

In December 2016, Plaintiff stated that his lower back pain was gone and his neck pain had improved. (AR 23, 610.)

In January 2017, Plaintiff was seen complaining of neck pain that radiated to his upper extremities, but reported that his headaches had improved. (AR 23, 608.) Other than elevated blood pressure, he had a completely normal physical examination. (AR 23, 608.)

Plaintiff reported for a follow up in April 2017 and reported that his headaches had decreased. (AR 23.) He was found to be alert and oriented, and it was noted that he demonstrated no pain behavior throughout the examination. (AR 23, 603.) His gait was not antalgic and he did not use an assistive device. (AR 23, 603.)

Plaintiff was seen in June 2017, and was alert and oriented and in no acute distress. (AR 23, 658.) Plaintiff had a normal gait and posture and did not use an assistive device. (AR 23, 658.) Neurologically he had normal muscle tone to the intrinsic and extrinsic muscles in the upper extremities, normal deep tendon reflexes to both upper extremities and no resting tremor or intention tremor. (AR 23, 658.)

The Court finds no merit to Plaintiff's argument that the ALJ considered the doctor opinions in isolation.

To the extent that Plaintiff is arguing that Drs. Holvik and Tariq both opined greater limitations than found by the ALJ, the record contains opinions by multiple physicians that assessed Plaintiff's physical limitations and expressed differing opinions. It is for the ALJ to resolve these inconsistencies in the medical record. Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999); Batson, 359 F.3d at 1195. Questions on the credibility of the physicians and resolving the conflicts in the testimony of the physicians are functions solely for the Secretary, Morgan, 169 F.3d at 601, and the issue before the Court is whether the ALJ provided specific and legitimate reasons to reject the opinions of the treating physicians that are supported by substantial evidence in the record, Thomas, 278 F.3d at 957. The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence and stating his interpretation of the evidence and making findings. Id. at 957; Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989). Plaintiff argues for a different result based on his

interpretation of the evidence, but "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." Burch, 400 F.3d at 679.

2. Whether the ALJ Erred by Failing to Consider the Factors Listed in Section 404.1527

Plaintiff contends that the ALJ did not comment on the factors listed in 404.1527 and that that failure alone requires remand. However, the regulations do not state that the ALJ must discuss the factors in the opinion, but that the ALJ must consider the factors.

A treating physician's opinion is entitled to controlling weight on the issue of the nature and severity of the claimant's impairment where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). "If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.' " Orn, 495 F.3d at 632 (citing 20 C.F.R. § 404.1527(d)(2). "In that event, the ALJ is instructed by § 404.1527(d)(2) to consider the factors listed in § 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician." Orn, 495 F.3d at 632. The factors to be considered include the " '[l]ength of the treatment relationship and the frequency of examination' by the treating physician, the '[n]ature and extent of the treatment relationship' between the patient and the treating physician, the '[s]upportability' of the physician's opinion with medical evidence, and the consistency of the physician's opinion with the record as a whole.' " Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1527(c)(2)-(6)). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Ghanim, 763 F.3d at 1161 (quoting Orn, 495 F.3d at 631).

Here, the ALJ set forth a detailed description of the medical record describing the treatment Plaintiff received from his physicians (AR 21-23), and found that the opinions of Drs. Holvik and Tariq were inconsistent with the other medical opinions in the record and the evidence of record as a whole. (AR 25.) Further, the ALJ found that the upper extremity restrictions were excessive in light of the objective evidence. (AR 25.) The Court finds that the

ALJ properly considered the factors identified in section 404.1527 and the question is whether the reasons provided by the ALJ to reject the limitations opined are specific and legitimate and supported by substantial evidence in the record.

### 3. Whether the ALJ Provided Specific and Legitimate Reasons for the Weight Provided to the Treating Physicians' Opinions that are Supported by Substantial Evidence

Plaintiff contends that the five reasons provided by the ALJ to reject the treating physicians' opinions are legally insufficient. Plaintiff argues that the majority of the reasons assert that the opinions are unsupported or inconsistent with the medical evidence and that the ALJ adopted a selective reading of the medical evidence. Defendant counters that the ALJ properly considered that the opinions of Plaintiff's treating physicians were unsupported by the overall record and conflicted with the other opinion and medical evidence in the record.

The ALJ gave little weight to the opinions of Drs. Holvik and Tariq finding that the opinions greatly limited Plaintiff's use of his lower extremities which is inconsistent with his reports that his upper extremities were his major impairment. (AR 25.) The ALJ also found that the opinions were not well supported, were inconsistent with the opinions of Drs. Verma and Resnik which were found to be consistent with the medical evidence as a whole, were inconsistent with the medical record as a whole, and the upper extremity restrictions were excessive in light of the objective evidence. (AR 25.) The ALJ also found that Dr. Tariq's opinion that Plaintiff was unable to work was an opinion reserved for the commissioner. (AR 25-26.)

### a. Dr. Holvik's Opinion

The ALJ considered Dr. Holvik's November 9, 2015 opinion. (AR 25.) Dr. Holvik completed a physical medical source statement. (AR 446-449.) Dr. Holvik stated that Plaintiff's symptoms are pain, headaches, dizziness and weakness in left arm. (AR 446.) Plaintiff had a daily headache and intermittent severe pounding headaches with shooting pain in the left arm aggravated by activity. (AR 446.) The objective signs supporting his limitations were "trigger point occipital L. Trap with reduced left grip strength and limited range of motion in the neck." (AR 446.) Plaintiff had limited response to medication (AR 446.)

1    The ALJ considered that Dr. Holvik opined that Plaintiff could sit and stand/walk for

2    about 2 hours in an 8 hour work day with normal breaks.  (AR 25, 447.)[2]  He could rarely twist,

3    stoop, crouch, squat, climb stairs and never climb ladders.  (AR 25, 447.)  Plaintiff could do no

4    overhead reaching bilaterally, can use his hands and arms 12.5 percent of an eight hour workday

5    and his fingers 25 percent of a workday. (AR 25, 448.)  Plaintiff would be absent from work

6    more than four days per month.  (AR 25, 449.)

7            **b.    Dr. Tariq's Opinion**

8            The ALJ also considered Dr. Tariq's August 11, 2016 opinion.  (AR 25.)  Dr. Tariq

9    completed a physical medical source statement.  (AR 458-461.)  Dr. Tariq diagnosed Plaintiff

10   with severe neck pain, degenerative disc disease of the cervical spine, and anxiety.  (AR 458.)

11   Plaintiff's symptoms were noted to be severe neck pain with occipital headaches and neck pain

12   that radiates down both hands and with paresthesias.  (AR 458.)  Dr. Tariq stated that any minor

13   neck movement triggers severe headaches.  (AR 458.)  Plaintiff had severe throbbing headaches

14   and neck pain (8-10) precipitated by minor neck movements even with medication.  (AR 458.)

15   Plaintiff had severe restriction of neck range of motion due to pain.  (AR 458.)  Dr. Tariq

16   reported that Plaintiff has had injections in the neck with no relief and is on morphine for pain

17   control.  (AR 458.)

18           The ALJ considered that Dr. Tariq opined that Plaintiff could sit for less than 2 hours in

19   an 8 hour workday and stand/walk for less than 2 hours in an 8 hour workday; and can never lift

20   or carry anything.[3]  (AR 25, 459-460.)  Plaintiff could never twist, bend, stoop, squat, or climb

21   ladders and rarely climb stairs.  (AR 25, 460.)  He could use his hands, fingers and arms only one

22

23   [2] Dr. Holvik also opined that Plaintiff could walk 2 blocks without rest or severe pain; could sit or stand for 30
     minutes at one time; must shift positions and needs unscheduled breaks of 30 minutes to one hour before returning
24   to work due to pain and dizziness; and could occasionally lift less than 10 pounds and rarely lift 10 pounds.  (AR
     447.)

25   [3] Dr. Tariq also opined that Plaintiff can walk less than one block; must shift positions and needs unscheduled
26   breaks of thirty minutes to one hour before returning to work due to pain and dizziness; can sit for 5 minutes at one
     time before needing to recline; and can stand for 5 minutes.  (AR 447.)  Plaintiff needed a job that allows shifting of
27   positions and must walk for 5 minutes every 10 minutes; requires 8 to 10 unscheduled breaks during an 8 hour
     workday and must rest for 20 to 30 minutes before returning to work due to pain/paresthesias, numbness and adverse
28   effects of medication; and requires use of cane or other hand-held assistive device due to pain and dizziness.  (AR
     459-460.)

percent of an eight hour workday as any minor neck movement causes severe symptoms. (AR 25, 460.) Dr. Tariq opined that Plaintiff would be absent from work more than four times per month. (AR 25, 461.)

The ALJ also considered that on August 9, 2016, Dr. Tariq opined in treatment notes that Plaintiff cannot work. (AR 25, 591.)

### c. ALJ did not err in rejecting Dr. Tariq's opinion that Plaintiff is unable to work

The ALJ rejected Dr. Tariq's opinion that Plaintiff was unable to work because the issue of employability is reserved for the Commissioner. (AR 25.) While the ALJ must consider all medical evidence, "[t]he treating physician's opinion is not" "necessarily conclusive as to either physical condition or the ultimate issue of disability." Magallanes, 881 F.2d at 751. But the ALJ may not simply reject the treating physician's opinion on the ultimate issue of disability. Ghanim, 763 F.3d at 1161. To reject the contradicted opinion of the treating physician, the ALJ must provide specific and legitimate reasons that are supported by substantial evidence. Id.

Here, the ALJ considered the opinion of Dr. Tariq, but did not accept his ultimate conclusion that Plaintiff was not employable. Under the regulations, a medical opinion is a statement from an acceptable medical source that reflects judgment about the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(a)(1). Opinions on some issues are not medical opinions, but are opinions on issues reserved for the Commissioner. 20 C.F.R. § 404.1527(a)(1). One such issue is that the claimant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(d)(1). The ALJ does not give any special significance to opinions on issues that are reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(3). As this issue is reserved for the Commissioner, the Court finds that the ALJ did not err in rejecting Dr. Tariq's opinion that Plaintiff was not employable.

### d. ALJ provided specific and legitimate reasons for the weight provided to the treating physician opinions

#### i. Medical record

The medical record from May 29, 2014 until May 4, 2015 demonstrates that Plaintiff generally had normal musculoskeletal examinations with normal muscle strength, adequate range

of motion of the extremities, normal muscle strength and tone, and a stable gait; and generally his neck was supple and symmetric with full range of motion without pain. (AR 361, 364, 369, 373, 375, 376, 379, 380.) There are occasional findings of limited range of motion in the neck with pain. (AR 370, 381.) There are also a few findings regarding trigger points in the right or left "trap" or long heads of the biceps.) (AR 375 (right), 377 (bilateral), 380 (biceps).)[4]

In June 2015, examination of Plaintiff's neck showed slight flexion with limited range of motion due to pain and left scalene trigger point with radiation of pain into the face. (AR 443.) Plaintiff had adequate range of motion of all the extremities with no gross abnormalities. (AR 443.) His gait was stable and motor strength and tone were normal. (AR 444.)

On July 6, 2015, Plaintiff's neck was supple and symmetric and there was "trigger point TTP along B traps." (AR 441.) Musculoskeletal examination was the same as the prior visit. (AR 442.) Plaintiff reported that his current medication regimen was controlling his symptoms at this time and his current medical state was noted to be stable. (AR 441, 442.)

On August 3, 2015, Plaintiff reported that his symptoms had been worsening over the past two weeks but he was having no problems with his right arm. (AR 439.) His neck was supple and symmetric but with limited range of motion due to pain. (AR 439.) His musculoskeletal examination remained the same. (AR 439.)

Plaintiff was seen by Dr. Verma for a consultative examination on August 27, 2015. (AR 419-426.) Neck examination was unremarkable. (AR 422.) Plaintiff had normal range of motion in the forearms and wrists bilaterally, except for some decreased dorsiflexion and palmar flexon range of motion in the left wrist. (AR 422-423.) It was noted that there was no swelling or tenderness in the left wrist. (AR 423.) Lower extremity examination was unremarkable with all range of motion within normal limits. (AR 423.) Examination of the cervical spine revealed muscle spasm and tenderness on the posterior neck and bilateral upper back with decreased cervical spine range of motion. (AR 423.) Plaintiff had a normal examination of the

---

[4] Dr. Holvik completed a physical medical source statement on June 1, 2015, that was somewhat less restrictive than the 2016 opinion. (AR 413-414.) Plaintiff does not argue that the ALJ erred by failing to address this opinion and any such error would be harmless as the standing/walking during an 8 hour day and lifting carrying limitations opined by Dr. Holvik and addressed by the ALJ in the opinion are the same and the reasons asserted to reject the August 2015 opinion would equally apply to the June 2015 opinion.

thoracolumbar spine.  (AR 423.)  Straight leg raising was negative in both the sitting and supine positions bilaterally.  (AR 423.)  Plaintiff had no deformities of the hands and was able to manipulate the use of a pen with ease.  (AR 423.)  He had no restrictions of the use of his hands during the examination.  (AR 423.)  He was able to approximate fingers and make a fist without difficulty bilaterally and pinch positioning was achieved adequately bilaterally.  (AR 423.)  Cranial nerves II -XII were grossly normal.  (AR 424.)  Plaintiff's motor examination revealed normal muscle tone and bulk with essentially normal strength by manual muscle testing in all major muscle groups of the upper and lower extremities graded at 5/5.  (AR 424.)  His grip strength was not commensurate with motor strength and effort was noted to be variable.  (AR 424.)  The left hand was weaker than the right.  (AR 424.)  Plaintiff's gait was normal.  (AR 424.)

On August 31, 2015, Plaintiff was seen and stated that he only had dizziness when he bent over to stand up and he was no longer working.  (AR 437.)  His neck was supple and symmetric with full range of motion without pain.  (AR 437.)  Plaintiff had adequate range of motion of the extremities with no gross abnormalities.  (AR 437.)  His gait was normal and he had normal muscle strength and tone.  (AR 437.)

On September 30, 2015, Plaintiff reported that he was doing well and that the change in his medication had good reduction in his headaches. (AR 436.)  His headaches were a 1/10 when he woke up and would get up to a 3 or 4 if he did too much during the day.  (AR 436.)  He complained that he was having neck pain.  (AR 436.)  Neck examination is noted as supple and symmetrical with range of motion limited due to pain.  (AR 436.)  There is "trigger point TTP R Trap and paravertebral muscles."  (AR 436.)  Musculoskeletal examination remained the same.  (AR 436.)

On October 29, 2015, Plaintiff reported that he tried pruning his trees and doing a few things and it aggravated things.  (AR 434.)  He complained of pounding headaches for two weeks and left arm pain that was shooting down into his hand.  (AR 434.)  Neck examination revealed fair range of motion.  (AR 434.)  Plaintiff had "trigger point TTP at L Medial scapular border superior trap and base of the occiput."  (AR 434.)  Musculoskeletal examination remained

the same.  (AR 434.)

On November 9, 2015, Dr. Holvik completed the medical source statement.  (AR 446-449.)

Plaintiff was next seen by Dr. Nasr on March 16, 2016.  (AR 635.)  Plaintiff's gait was noted to be not antalgic and he used no assistive devices.  (AR 635.)  He had positive tenderness overlying the cervical paravertebral muscles left greater than right bilateral; positive tenderness overlying the occipital groove right/left; and positive tenderness overlying the cervical facets right/left.  (AR 635.)  His muscle strength was 5/5 bilateral and symmetrical in the upper extremities.  (AR 635.)  Range of motion of the cervical spine showed cervical flexion: 60 degrees, extension: 20 degrees, lateral bending: 20 degrees.  (AR 635.)  Plaintiff had negative Phalan and Tinels tests.  (AR 635.)  Neurological examination showed intact light touch and pinprick bilateral upper extremity with the exception of left C6.  (AR 634.)  Cranial nerves II through XII were intact.  (AR 634.)  Hoffman sign was negative.  (AR 634.)  Spurling test was positive on the right and negative on the left.  (AR 634.)  The extremities had no edema, no cyanosis, and intact peripheral pulse.  (AR 635.  Plaintiff had positive facet loading.  (AR 635.)  It is noted that Plaintiff demonstrated no pain behavior throughout the examination.  (AR 635.)

Plaintiff attended physical therapy from March 16, 2016 through April 28, 2016 for his shoulder and it is noted on April 28, 2016, that his shoulder was doing fine.  (AR 521, 523, 525, 527, 529, 531, 533, 537, 539, 541, 543.)

Plaintiff saw Dr. Nasr on May 10, 2016, and May 27, 2016, and his examination results remained the same and it is again noted that Plaintiff demonstrated no pain behavior during examination.  (AR 630, 632.)

Plaintiff received a cervical facet joint injection on May 31, 2016.  (AR 628.)  He attended physical therapy during June 2016 and is noted to present with impaired cognition and to give inconsistent responses.  (AR 499, 501, 503.)

On June 22, 2016, Plaintiff was seen by Dr. Nasr and reported greater than fifty percent improvement from the injection.  (AR 626.)  Examination results remain the same.  (AR 626.)  Plaintiff went to physical therapy on June 28, 2016, and stated that he slipped and fell the prior

day and jerked his neck, but it feels fine. (AR 495.) Plaintiff stated that he woke up Sunday morning feeling great and had been feeling good since. (AR 495.) He was complaining of phantom pain in his hands and arms and stated that his pain medication slows it down for about an hour and a half. (AR 495.) Plaintiff said he was feeling better in his neck than he had in a long time. (AR 495.) Again it is noted that is appeared to be heavily under the influence of various substances and gave very inconsistent responses. (AR 495.)

On June 29, 2016, Plaintiff saw Dr. Nasr and complained of a new whiplash injury. (AR 624.) Examination results remained the same. (AR 624.)

Plaintiff was seen by Dr. Nasr on July 14, 2016, complaining of neck and shoulder pain after he drove to Porterville. (AR 622.) Examination results remained the same. (AR 622.)

Plaintiff saw Dr. Tariq on July 18, 2016, and reported that his neck pain was shooting down his arm into his hand after he had driven to Porterville looking for work as a carpenter on the prior Wednesday. (AR 596.) Plaintiff had limited range of motion in his neck due to pain and it is noted that his exam is worse than the last visit when he was able to flex and extend comfortably. (AR 597.)

Plaintiff saw Dr. Tariq on July 26, 2016, complaining of severe neck pain and headaches caused by any little movement of his neck. (AR 594.) Plaintiff had restricted range of motion in his neck and he was noted to be in mild distress due to pain. (AR 594.)

On July 27, 2016, Plaintiff was seen by Dr. Nasr complaining of worsening pain. (AR 620.) Plaintiff reported that the injections had helped for two months. Examination results remained the same as the June 29, 2016 examination and it is noted that he displays no pain behavior during the examination. (AR 620.)

On August 9, 2016, Plaintiff was seen by Dr. Tariq for follow up of his neck pain. (AR 589.) He was noted to be in mild distress due to pain. (AR 590.) Plaintiff's range of motion in his neck was restricted due to pain and he was wearing an Aspen collar. (AR 591.)

On August 11, 2016, Dr. Tariq completed the physical medical source statement. (AR 458-461.)

Plaintiff had a neurological consultation with Dr. Abumari on August 16, 2016. (AR

462-463.) Plaintiff's cranial nerves II through XII were grossly intact. (AR 463.) Finger to nose maneuver and alternating rapid movement of upper extremities were within normal limits; and Plaintiff's motor strength in the upper and lower extremities was 5/5. (AR 463.) Deep tendon reflexes were 2+ throughout the upper and lower extremities. (AR 463.) Cutaneous-lantar reflexes were downgoing. (AR 463.) There was no clonus and sensory examination was grossly intact. (AR 463.) On examination of the extremities, Plaintiff was able to stand on his tiptoes with difficulty. (AR 463.) He was found not to be a surgical candidate. (AR 463.)

On August 25, 2016, Plaintiff was seen and stated that he was feeling better but his fingertips were numb and tingling. (AR 618.) He reported that he was having fewer headaches and he was doing okay although he had pain at night. (AR 681.) Examination findings were the same as the July 14, 2016 visit and it was noted that he exhibited no pain behavior throughout the examination. (AR 618.)

On August 26, 2016, Plaintiff was seen by Dr. Tariq for a follow up and reported that he continued to have symptoms brought on by the smallest movement. (AR 587.) On examination, neck range of motion was restricted due to pain and he had trigger points in the left and right sternocleidomastoid, left scalene and upper part of left trapezius and pressure on these reproduced his pain/paresthesias and headache. (AR 587.) The record notes that Plaintiff has not been deemed a surgical candidate by two neurosurgeons yet he continues to have severe debilitating neck pain headaches that are precipitated by the slightest neck movement and paresthesia in his hands and fingers that cannot be explained by MRI. (AR 587.) Dr. Tariq noted that he does have multiple trigger points pressure which reproduces his symptoms. (AR 587.) Plaintiff was to continue pain management as per Dr. Nasr but also to be sent to PT targeted specifically at treatment of trigger points. (AR 587.)

Plaintiff received a cervical steroid injection on September 8, 2016. (AR 617.)

On September 22, 2016, Plaintiff went to physical therapy and reported that he has a TENS unit at home but does not use it because he is afraid it will somehow make his pain worse. (AR 480.) He has tried all kinds of creams and more than 30 pain medications to get to the place he is now with headaches controlled at a lower intensity. (AR 480.) Plaintiff has seen

1   neurologists and had a nerve conduction study and was told the tingling in his arms was

2   unrelated to his neck.  (AR 480.)

3        On September 29, 2016, Plaintiff was seen in Dr. Tariq's office and reported that he had

4   an epidural injection that had worked well and he was taking Morphine.  (AR 580.)  Plaintiff had

5   restricted range of motion in his neck due to pain and the same trigger points as the August 26,

6   2016 visit.  (AR 581.)

7        Plaintiff was seen in Dr. Nasr's office on October 6, 2016 and reported that his headaches

8   were better with a ninety percent improvement.  (AR 615.)  He reported the numbness in his

9   hands has decreased and he was able to stand a little longer.  (AR 615.)  Plaintiff exhibited no

10  pain behavior throughout the examination and examination results remain the same as the July

11  27, 2016 visit.

12       Plaintiff had two physical therapy appointments in October and was discharged because

13  he was unable to tolerate treatment.  (AR 470, 471, 474.)  On October 18, 2016, Plaintiff was

14  seen by Dr. Nasr and examination results remained the same as the prior visit.  (AR 613.)

15       On November 29, 2016, Plaintiff was seen and was noted to be in mild distress due to

16  pain.  (AR 578.)  Plaintiff reported that he had left his wife because he thought she was

17  poisoning him. (AR 578.)  On this same date, he was seen in Dr. Nasr's office and reported that

18  since he left his wife his pain level had gone from a 7/10 to 1/10.  (AR 611.)  Plaintiff was noted

19  to display no pain behavior throughout the examination.  (AR 611.)  His gait was not antalgic

20  and he did not use an assistive device.  (AR 611.)

21       On December 13, 2016, Plaintiff reported that he had weaned himself off morphine and

22  was doing well with no complaints.  (AR 572.)  Plaintiff was noted to be in mild distress due to

23  pain.  (AR 573.)

24       On December 14, 2016, Plaintiff reported that his lower back pain was gone and his neck

25  pain was improved.  (AR 610.)  He had weaned himself off his medication and cancelled his

26  neck surgery.  (AR 610.)  He is noted to exhibit no pain behavior throughout the examination.

27  (AR 610.)  His gait was not antalgic and he did not use an assistive device.  (AR 610.)

28       Plaintiff was seen on January 12, 2017, complaining of neck pain that was radiating to

the upper extremities and numbness and tingling.  He reported that his headaches had improved and that he received very good relief with the injection in September.  (AR 608.)  He is noted to exhibit no pain behavior throughout the examination.  (AR 608.)  His gait was not antalgic and he did not use an assistive device.  (AR 608.)

On February 9, 2017, Plaintiff received another cervical steroid injection.  (AR 606.)

On February 15, 2017, Plaintiff reported the numbness and tingling to both hands had improved.  (AR 605.)  He is noted to exhibit no pain behavior throughout the examination.  (AR 605.)  His gait was not antalgic and he did not use an assistive device.  (AR 605.)

On February 28, 2019, Plaintiff was noted to be in mild distress due to pain.  (AR 570.)

On March 9, 2017, Plaintiff complained of neck pain that was out of control.  (AR 604.)  He stated that his headaches were not as frequent and the numbness and tingling had improved to both hands.  (AR 604.)  He is noted to exhibit no pain behavior throughout the examination.  (AR 604.)  His gait was not antalgic and he did not use an assistive device.  (AR 604.)

On March 21, 2017, Plaintiff was seen by Dr. Tariq and reported that he was able to function better now that his pain was controlled and that he had better range of motion of his hands and neck.  (AR 568.)  Plaintiff had an unremarkable examination.  (AR 568-569.)

On April 6, 2019, Plaintiff reported that he still has neck pain but the the patches help control it.  (AR 603.)  He has adequate analgesia and activity of daily living.  (AR 603.)  He is noted to exhibit no pain behavior throughout the examination.  (AR 603.)  His gait was not antalgic and he did not use an assistive device.  (AR 603.)

On April 18, 2017, Plaintiff saw Dr. Tariq and reported that his pain was well controlled.  (AR 650.)  His examination was unremarkable.  (AR 650.)

On May 23, 2019, Plaintiff had an annual examination and his examination results were unremarkable.  (AR 648.)

On June 16, 2017, Plaintiff was seen for lacerations on his left hand after he was injured while using a table saw at home.  (AR 656.)  He had normal muscle tone to the extrinsic and intrinsic muscles in the upper extremities.  (AR 658.)  There was no evidence of a resting tremor or an intention tremor.  (AR 658.)  Plaintiff demonstrated normal deep tendon reflex to both

upper extremities. (AR 658.) Plaintiff ambulated with a normal gait without assistive device and demonstrated normal posture without any protective posturing. (AR 658.) Examination of the left hand revealed a transverse laceration through the germinal matrix of the nailbed and another 2 cm laceration of the volar distal phalanx. (AR 659.) Plaintiff was able to fully extend. (AR 659.) He was able to flex at the proximal interphalangeal joint and distal interphalangeal joint but range of motion was limited due to pain. (AR 659.) Plaintiff had reconstructive surgery and appeared for post-operative examinations where he was found to be healing well. (AR 661-668.)

On August 17, 2017, Plaintiff was seen by Dr. Tariq complaining of 6/10 pain down both arms spreading distally toward his digits. (AR 646.) Plaintiff had an unremarkable examination. (AR 646.)

ii.     Inconsistency with medical record

The ALJ rejected the opinions of Drs. Holvik and Tariq to the extent that they greatly limited his use of his lower extremities finding that it was inconsistent with Plaintiff's complaint that the major impairment was his upper extremities. (AR 25.) Plaintiff argues that the record demonstrates that his neck and cervical spine symptoms also limit his use of his lower extremities. However, the ALJ pointed to the generally normal examinations, including his back and lower extremity examinations, which are inconsistent with the physician opinions that Plaintiff is severely limited in the use of his lower extremities.

As to Dr. Holvik, the ALJ noted that the generally normal findings in the record are inconsistent with the lower extremity limitations opined. (AR 24.) Dr. Holvik opined on November 9, 2015, that Plaintiff was unable to walk more than two blocks, sit or stand more than thirty minutes, and could sit or stand/walk for about 2 hours in an 8 hour workday. (AR 447.) Dr. Holvik opined that Plaintiff's objective signs were trigger point occipital left trap with reduced grip strength and limited range of motion in the neck. (AR 446.)

Although Plaintiff argues that the lower extremity limitations are related to his neck and cervical spine symptoms, the record demonstrates that Plaintiff generally had normal neck and spinal examinations with some limited range of motion and trigger points in his neck and

shoulder area. As demonstrated by the medical record, there are only occasional findings prior to June 2015 and Plaintiff generally had normal physical examination of his neck. (AR 361, 364, 369, 373, 375, 376, 379, 380.)

In June 2015, examination of Plaintiff's neck shows slight flexion with limited range of motion due to pain and left scalene trigger point with radiation of pain into the face. (AR 443.) In July 2015, Plaintiff's neck was supple and symmetrical but there was some trigger point TTP along the bilateral traps. (AR 441.) But Plaintiff reported that his current medication regimen was controlling his symptoms and he was noted to be stable. (AR 441, 442.) Although Plaintiff reported that his symptoms had worsened in November 2016, on examination his neck was supple and symmetric with limited range of motion due to pain and musculoskeletal examination remained the same. (AR 439.)

The ALJ also considered that during the period of time prior to Dr. Holvik completing the form, Plaintiff was working two to four hours a day in construction. (AR 21, 372.) Plaintiff told Dr. Holvik on February 5, 2015, that he was unable to look up or use his nail gun for very long and that he has been working. (AR 374.) In March 5, 2015, Plaintiff reported that he was functioning well and had a good three hours a day that he was able to do things. (AR 377.) It is not until August 2015 that Plaintiff reports that he is not working any longer. (AR 438.) But in October 2015, Plaintiff reported that he was doing well and only got headaches if he did too much during the day. (AR 436.) In October 2015, Plaintiff reported that he was pruning his trees and doing a few things which aggravated his pain. (AR 434.)

Further, in March 2016, Plaintiff reported that he was doing household chores over the weekend.[5] (AR 22, 539.) On April 14, 2016, it was noted in physical therapy that Plaintiff was able to perform his exercises with a neck brace. (AR 529.) On April 21, 2016, Plaintiff reported that he was able to mow the lawn the day before without his neck brace. (AR 525.)

As to Dr. Tariq, on August 11, 2016, he also opined that Plaintiff was only able to sit for

---

[5] There are no medical records from the date of Dr. Holvik's November 15, 2016 opinion until March 9, 2016 where Dr. Nasr found that Plaintiff demonstrated no pain behavior during examination despite the positive findings. (AR 635. There are some physical therapy records and the next visit is May 10, 2016 with Dr. Nasr where it again noted that there is no pain behavior during examination. (AR 632.)

less than 2 hours in an 8 hour workday and stand/walk for less than two hours in an 8 hour workday. (AR 459-460.) Dr. Tariq stated this was due to severe neck pain with occipital headaches and pain that radiates down both hands with paresthesias. (AR 458.) Dr. Tariq also stated that Plaintiff has been treated with neck injections with no relief and is on morphine. (AR 458.)

However, the medical record demonstrates that Plaintiff reported significant relief from the epidural injections and that his pain was well controlled with the injections and morphine. (AR 569, 580, 618, 620, 626.) On July 18, 2016, Dr. Tariq noted that at the prior visit Plaintiff had been able to flex and extend his neck comfortably, and that he had aggravated his neck when he drove to Porterville looking for work. (AR 596, 597.)

The ALJ could reasonable conclude that Drs. Holvik and Tariq's opined lower extremity limitations were inconsistent with the evidence in the record.

Further, the ALJ found that the upper extremity limitations were excessive in light of the objective medical evidence. (AR 25.) Dr. Holvik opined that Plaintiff can rarely lift less than ten pounds and never lift more than ten pounds; can only use his bilateral hands for grasping and turning 12.5 percent of the day; could only use his bilateral fingers for fine manipulation twenty five percent of the day and could not use his bilateral arms for reaching overhead. (AR 448.)

On August 16, 2016, Dr. Tariq opined that Plaintiff can never lift less than 10 pounds; and can use his hands, fingers and arms only 1 percent of an 8 hour workday because any minor neck movement causes severe symptoms. (AR 460.) The only evidence in the record to support such a contentions is that Plaintiff complains that any minor neck movement causes severe symptoms. However, an ALJ can reject a physician's opinion that is premised on a claimant's subjective complaints that have been properly discounted. Fair v. Bowen, 885 F.2d 597, 605 (1989).

Although there are some findings that pressure on the trigger points reproduced his pain/paresthias and headaches (AR 587), there are no findings that on examination minor movement of Plaintiff's head or neck caused him to have severe symptoms.

The ALJ noted that Plaintiff reported improvement of his symptoms and that despite the

fact that Plaintiff complained of headaches, he had normal examinations and was noted to display no pain behavior during examination. (AR 22-23.) In fact, the record consistently reports that Plaintiff exhibited no pain during examination. (AR 361, 364, 366, 369, 373, 375, 379, 422, 437, 603, 604, 605, 608, 610, 611, 613, 615, 618, 620, 622, 624, 626, 630, 632, 635.) Even where Plaintiff's range of motion in his neck is limited, trigger points are found, or pressure on the trigger points reproduces his symptoms, there are no findings that movement exacerbated Plaintiff's symptoms. (AR 370, 377, 380, 433, 435, 439, 442, 444, 581, 584, 586, 591, 594, 597.) Physical therapy notes that Plaintiff's neck pain increased with movement of his arms over shoulder height and that chin tucks caused a slight headache. (AR 474, 482.) There is a single notation in the record on October 17, 2016, that all neck movements seemed to cause some aggravation of either headache, neck pain or pain shooting to his hands. (AR 474.) However, records subsequent to this indicate that Plaintiff is doing well and his pain is controlled by the injections and medication to the extent that Plaintiff cancelled a scheduled neck surgery and weaned himself off of medication. (AR 572, 604, 608, 610, 611.) The ALJ considered that Plaintiff's subsequent medical records showed that his symptoms had improved and he exhibited no pain behavior during examination. (AR 23.)

Inconsistency with the objective findings in the medical record are specific and legitimate reasons to reject a physician opinion. See Thomas, 278 F.3d at 957 (9th Cir. 2002) (clinical findings); Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (inconsistency with medical record). The ALJ provided specific and legitimate reasons to reject the limitations opined by Drs. Holvik and Tariq that are supported by substantial evidence in the record.

Plaintiff also argues that the ALJ should have contacted Drs. Holvik and Tariq to clear up any questions regarding Plaintiff's impairments or limitations. The ALJ has a duty to further develop the record where the evidence is ambiguous or the ALJ finds that the record is inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan, 242 F.3d at 1150.

Here, the ALJ did not find the opinions of either doctor to be ambiguous but found that they were inconsistent with the medical record and the objective medical findings. A specific

finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record where the record itself establishes the ambiguity or inadequacy.  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011).  The facts in this case are not similar to other instances in which the ALJ was found to have a duty to further develop the record.  See Tonapetyan, 242 F.3d at 1150-51 (ALJ erred by relying on testimony of physician who indicated more information was needed to make diagnosis); McLeod, 640 F.3d at 887 (ALJ erred by failing to obtain disability determination from the Veteran's Administration); Bonner v. Astrue, 725 F.Supp.2d 898, 901-902 (C.D. Cal. 2010) (ALJ erred where failed to determine if claimant's benefits were property terminated or should have been resumed after his release from prison); Hilliard v. Barnhart, 442 F.Supp.2d 813, 818-19 (N.D. Cal. 2006) (ALJ erred by failing to develop record where he relied on the opinion of a physician who recognized he did not have sufficient information to make a diagnosis).  The Court finds no error by the ALJ due to failing to develop the record.

Finally, Plaintiff argues that the ALJ erred by giving greater weight to the opinion of the consultative examiner who only saw Plaintiff on a single occasion.  However, opinions of doctors other than a claimant's treating physician, such as a consultative examiner can be substantial evidence.  Magallanes, 881 F.2d at 752.  Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict.  Andrews, 53 F.3d at 1041.  Here, Dr. Verma examined Plaintiff on August 27, 2015 and his notes detail the findings of musculoskeletal and neurological examination.  (AR 422-424.)  Although the ALJ found that Dr. Resnick's opinion regarding Plaintiff's manipulative limitations was more consistent with the record as a whole, he gave significant weight to the rest of Dr. Verma's opinion finding that it was well supported, consistent with the limitations noted in the record, consistent with his own examination of Plaintiff, and consistent with the medical evidence of record as a whole.  (AR 24.)  Further, the ALJ gave significant weigh to the opinion of Dr. Verma because he was an expert in the field.  (AR 24.)

The ALJ did not err in the weight provided to Dr. Verma's opinion based upon the fact that he only examined Plaintiff on one occasion.

### B.    Residual Functional Capacity

Plaintiff contends that the ALJ erred because the RFC did not account for any limitations due to his headaches which were found to be severe.  Plaintiff argues that the residual functional capacity did not account for the fact that he has headaches daily, his headaches are aggravated by movement of his neck, during a headache he would be off task, and that limitations should be included during the pendency of a headache.

Defendant counters that Plaintiff is arguing that the ALJ failed to account for his subject accounts of pain due to his headaches.  Defendant contends that the ALJ properly rejected Plaintiff's subjective pain testimony and evaluated the objective medical evidence concluding that his allegations of headaches were inconsistent with the objective medical evidence in the record.

A claimant's RFC is "the most [the claimant] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).  The RFC is "based on all the relevant evidence in [the] case record."  20 C.F.R. § 416.945(a)(1).  "The ALJ must consider a claimant's physical and mental abilities, § 416.920(b) and (c), as well as the total limiting effects caused by medically determinable impairments and the claimant's subjective experiences of pain, § 416.920(e)."  Garrison, 759 F.3d at 1011.  At step four the RFC is used to determine if a claimant can do past relevant work and at step five to determine if a claimant can adjust to other work.  Id.  "In order for the testimony of a VE to be considered reliable, the hypothetical posed must include 'all of the claimant's functional limitations, both physical and mental' supported by the record."  Thomas, 278 F.3d at 956.

Here, Plaintiff's challenge to the RFC is that it did not account for his subjective complaints of pain due to his headaches.[6]  Initially, the Court notes that Plaintiff vaguely challenges the ALJ's finding regarding Plaintiff's credibility due to his daily activities in a

---

[6] As discussed above, there are no objective findings in the record that support Plaintiff's complaints of headache and therefore, the evidence to be considered would be his subjective complaints.

footnote. (Pl.'s Brief in Support of Remand, p. 24 n.6.) "A footnote is the wrong place for substantive arguments on the merits of a motion, particularly where such arguments provide independent bases for dismissing a claim not otherwise addressed in the motion." First Advantage Background Servs. Corp. v. Private Eyes, Inc., 569 F.Supp. 2d 929, 935 n.1 (N.D. Cal. 2008); see also United States v. Svoboda, 347 F.3d 471, 480 (2d Cir. 2003) (an argument that is mentioned only in a footnote is not adequately raised). Plaintiff is advised courts are not mind readers and a "party has a duty 'to spell out its arguments squarely and distinctly.... [rather than being] allowed to defeat the system by seeding the record with mysterious references ... hoping to set the stage for an ambush should the ensuing ruling fail to suit.' " McCoy v. Massachusetts Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991) (quoting Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir.1988). Substantive arguments should be raised within the brief itself.

### 1. Whether ALJ Erred in Finding Plaintiff's Allegations of Pain Not Credible

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn, 495 F.3d at 635 (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that his impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Then "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter v. Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015). "The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not

arbitrarily discredit the claimant's testimony." Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, 504 F.3d at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . .." Tommasetti, 533 F.3d at 1039 (quoting Smolen, 80 F.3d at 1284). The district court is constrained to review those reasons that the ALJ provided in finding the claimant's testimony not credible. Brown-Hunter, 806 F.3d at 492.

.        Defendant argues evidence within the record that the ALJ did not rely on in making the credibility determination, such as Plaintiff's statement that he had not driven within the past two to three years and the evidence that Plaintiff does do so including that in July 2016 Plaintiff drove to Visalia, he was continuing to look for work as a carpenter, and he was non-compliant with treatment. (Def.'s Answering Brief 18-19, 22, ECF No. 15.) While the Court may draw reasonable inferences from the ALJ's opinion, Magallanes, 881 F.2d at 755, it cannot consider Defendant's post hac rationalizations. "A reviewing court can evaluate an agency's decision only on the grounds articulated by the agency." Ceguerra v. Sec'y of Health & Human Servs., 933 F.2d 735, 738 (9th Cir. 1991). The Court is constrained to review the reasons asserted by the ALJ. Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) ("It was error for the district court to affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss.")

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence and limiting effects of his symptoms was not consistent with the medical evidence and the other

evidence in the record.  (AR 19.)  The ALJ stated that he considered the factors identified in 20 C.F.R. § 404.1529(c)(3):

1. The claimant's daily activities;
2. The location, duration, frequency, and intensity of the claimant's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
5. Treatment other than medication the claimant receives or has received for relief of pain or other symptoms
6. Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 16-3p).

(AR 18-19.)

There are two grounds to use daily activities for an adverse credibility finding.  Orn, 495 F.3d at 639.  First, daily activities can form the basis of an adverse credibility determination if the claimant's activity contradicts his testimony.  Id.  Secondly, "daily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.' "  Id. (quoting Fair, 885 F.2d at 603).  The ALJ must make specific findings as to the daily activities and their transferability to conclude that the claimant's daily activities warrant an adverse credibility determination.  Orn, 495 F.3d at 639.  Here, the ALJ found that Plaintiff's daily activities were not consistent with his symptom testimony.  (AR 20.)

In making the credibility determination, the ALJ considered Plaintiff's reported activities: "he prepares easy meals, counts change, goes grocery shopping, uses a checkbook, does not need any special reminders to take care of his personal needs and grooming, goes outside one to two hours a week, does not need to be reminded to go places, follows written and spoken instructions fine, gets along with authority figures fines [sic], has never been fired or laid off from a job due to problems getting along with others, watches television, and has no problems getting along with family, friends, neighbors, or others."  (AR 20.)  The ALJ found these activities to be inconsistent with Plaintiff's statements that he has difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, climbing stairs, completing tasks, concentrating, and using his

hands. . . . he cannot lift anything without straining his neck, getting headaches, and experiencing bilateral hand pain. He indicated he also has balance issues, as well as difficulty lifting and grabbing. Regarding sitting, the claimant stated he can only sit for 15 to 20 minutes at a time before he has stress, pain, and pressure in his neck, as well as more sensations throughout his hands. Concerning lifting, he mentioned he can lift a gallon of milk or a bag of cat food that weighs 10 pounds. (AR 20.)

The limited activities that the ALJ relied on to discount Plaintiff's credibility are not inconsistent with his asserted abilities. Therefore, this is not a clear and convincing reason to reject Plaintiff's credibility.

Additionally, the ALJ found that the objective medical evidence did not support his allegations of disabling symptoms and limitations. (AR 20.) The determination that a claimant's complaints are inconsistent with clinical evaluations can satisfy the requirement of stating a clear and convincing reason for discrediting the claimant's testimony. Regennitter v. Commissioner of Social Sec. Admin., 166 F.3d 1294, 1297 9th Cir. 1999). But, "subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence. . . ." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

The ALJ erred by failing to provide a clear and convincing reason to find Plaintiff's pain testimony credible.

**C.      This Matter Shall be Remanded for Further Administrative Proceedings**

The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." Garrison, 759 F.3d at 1020. The credit as true doctrine allows "flexibility" which "is properly understood as requiring courts to remand for further proceedings when, even

though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled. Id. at 1021. "A claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." Strauss v. Comm'r of the Soc. Sec. Admin., 635 F.3d 1135, 1138 (9th Cir. 2011).

Here, as discussed above, the Court has found that the ALJ properly rejected the opinions of Drs. Holvik and Tariq and Plaintiff has not challenged the other medical opinions which the ALJ relied in finding that Plaintiff is capable of light work.

"[A] reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony." Brown-Hunter, 806 F.3d at 495 (quoting Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1106 (9th Cir.2014)). Further, upon review of the record and as discussed above, there is substantial evidence that Plaintiff's symptom complaints are not as severe as he has alleged. There is evidence in the record that he has responded well to treatment such that he cancelled a neck surgery and weaned himself off his pain medication. (AR 568, 573, 575, 580, 603, 608, 610, 611, 615, 650.) Additionally, as pointed out by Defendant in the opposition brief, the record demonstrates that Plaintiff was not credible in testifying that he had not driven in two years as he drove to doctor's appointments and to Porterville looking for work during that time period. (AR 541, 596, 622.) Finally, the record contains evidence that Plaintiff was continuing to engage in activities such as doing carpentry work and doing yard work which often were the cause of the aggravation of his symptoms and activities inconsistent with his testimony as to his limitations. (AR 372, 375, 376, 434, 596.)

The Court finds that the record as a whole creates a serious doubt that Plaintiff is in fact disabled and for this reason, the matter is remanded to the ALJ for further proceedings. Upon remand, the ALJ shall reconsider Plaintiff's symptom testimony.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ erred by failing to provide clear and

convincing reasons to reject Plaintiff's symptom testimony.  Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED and this matter is remanded back to the Commissioner of Social Security for further proceedings consistent with this order.  It is FURTHER ORDERED that judgment be entered in favor of Plaintiff Raymond Richard Prine, Jr. and against Defendant Commissioner of Social Security.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **October 2, 2019**

UNITED STATES MAGISTRATE JUDGE